Slip Op. 18–73

### UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| MID CONTINENT STEEL & WIRE, INC., | : | |
| Plaintiff, | : | |
| v. | : | Before: Richard K. Eaton, Judge |
| UNITED STATES, | : | Court No. 17-00051 |
| Defendant, | : | |
| and | : | |
| THE STANLEY WORKS (LANGFANG) FASTENING SYSTEMS CO., LTD., *et al.*, | : | |
| Defendant-Intervenors. | : | |

## <u>OPINION</u>

[United States Department of Commerce's final results are sustained.]

Dated:   June 19, 2018

*Adam H. Gordon*, The Bristol Group PLLC, of Washington, DC, argued for plaintiff. With him on the brief was *Ping Gong*.

*Sosun Bae*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel on the brief was *Jessica DiPietro*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Lawrence J. Bogard*, Neville Peterson LLP, of Washington, DC, argued for defendant-intervenors. With him on the brief was *Peter J. Bogard*.

Eaton, Judge: This case involves the final results of the seventh administrative review of the antidumping duty order on steel nails from the People's Republic of China, covering the

period of review August 1, 2014, through July 31, 2015 ("POR"). *Certain Steel Nails From the*

*People's Rep. of China*, 82 Fed. Reg. 14,344 (Dep't Commerce Mar. 20, 2017) (final results), *as*

*amended by* 82 Fed. Reg. 19,217 (Dep't Commerce Apr. 26, 2017), and accompanying Issues

and Decision Memorandum, P.R. 289 at bar code 3551476-01 ("Final I&D Memo")

(collectively, the "Final Results").

　　In the Final Results, the United States Department of Commerce ("Commerce" or the

"Department") found that dumping of the subject nails occurred during the POR and calculated

an antidumping duty rate of 5.78 percent for The Stanley Works (Langfang) Fastening Systems

Co., Ltd. and Stanley Black & Decker, Inc. (collectively, "Stanley"), a mandatory respondent in

the review. *See* 82 Fed. Reg. at 19,218. Commerce also determined an "all-others" rate, pursuant

to 19 U.S.C. § 1673d(c)(5)(A) (2012), equal to the 5.78 percent rate calculated for Stanley.

Commerce applied the all-others rate to the seventeen companies that qualified for a separate

rate, but were not individually examined (the "Separate Rate Companies"). *See* 82 Fed. Reg. at

19,218. The Department assigned the only other mandatory respondent in the review, Tianjin

Lianda Group Co., Ltd. ("Lianda"), the countrywide rate (the "PRC-wide rate") of 118.04

percent because it failed to establish independence from the Chinese government. *See* Final I&D

Memo at 29; *see also* 82 Fed. Reg. at 19,219.

　　Mid Continent Steel & Wire, Inc. ("plaintiff" or "Mid Continent"), a U.S. fastener

producer, was the petitioner in the underlying review, and commenced this action to challenge

certain aspects of the Final Results. Mid Continent contends that: (1) Commerce's assignment of

the 5.78 percent all-others rate to the Separate Rate Companies is neither in accordance with law

nor supported by substantial evidence primarily because it does not reflect the companies'

"economic reality"; (2) Commerce's valuation of Stanley's sealing tape input is not based on the

best available information because the surrogate import data Commerce used to value the tape,

although more specific as to the base material, does not account for its adhesiveness; and

(3) Commerce's valuation of Stanley's plastic granules input is not based on the best available

information primarily because the granules are finished products, *i.e.*, ready for their ultimate

use, not unfinished products "in primary form," as Commerce found. *See* Pl.'s Br. Supp. Mot. J.

Agency R., ECF No. 29-1 ("Pl.'s Br."); *see also* Pl.'s Reply Br., ECF 34. Mid Continent asks the

court to remand this matter to Commerce with instructions to recalculate the all-others rate and

to amend its valuation of Stanley's sealing tape and plastic granules.

The United States (the "Government"), on behalf of Commerce, maintains that the Final

Results are supported by substantial evidence and otherwise in accordance with law. *See* Def.'s

Resp. Mot. J. Agency R., ECF No. 33 ("Def.'s Resp."). For its part, Stanley urges the court to

find that the record supports Commerce's valuation of its sealing tape and plastic granules. *See*

Stanley's Mem. Opp'n Mid Continent Mot. J. Admin. R., ECF No. 32 ("Stanley's Br.").

The court has jurisdiction under 28 U.S.C. § 1581(c) (2012), and, for the reasons below,

sustains the Final Results.


## BACKGROUND

On October 6, 2015, Commerce initiated the seventh administrative review of the subject

order. *See Initiation of Antidumping and Countervailing Duty Admin. Rev.*, 80 Fed. Reg. 60,356

(Dep't Commerce Oct. 6, 2015). Commerce asserts that, because of the large number of

exporters involved in the review (48), it limited the number of individually examined exporters

to two companies. *See* Selection of Respondents for Individual Rev. (Dec. 16, 2015), P.R. 76 at

3, 5, bar code 3426396-01, ECF No. 30 at tab 8. Commerce selected Stanley and Lianda as

mandatory respondents based on their volume of exports, pursuant to 19 U.S.C. § 1677f–

1(c)(2)(B). Stanley was the largest exporter, and Lianda was the fourth largest exporter, of steel

nails from China during the POR. *See* Third Selection of Respondent for Individual Rev. (Feb.

29, 2016), P.R. 129 at bar code 3446401-01, ECF No. 30 at tab 12.

It is worth noting that, although two companies, Tianjin Zhonglian Metals Ware Co., Ltd.

("Zhonglian"), and Suzhou Xingya Nail Co., Ltd. ("Suzhou"), exported higher volumes of

subject merchandise than Lianda during the POR, neither exporter participated as a mandatory

respondent, or otherwise, because (1) Mid Continent withdrew its request for review of

Zhonglian, and (2) Suzhou withdrew from the review early in the proceeding, refusing to

cooperate with the Department. *See* Third Selection of Respondent for Individual Rev. at 2-3.

During the review, Commerce issued its nonmarket economy questionnaires to Stanley

and Lianda. Based on Stanley's responses, Commerce determined that the company successfully

rebutted the presumption of *de jure* and *de facto* control[1] by the Chinese government and was

therefore eligible for a separate, company-specific rate. *See* Decision Mem. for the Prelim.

Results (Sept. 6, 2016), P.R. 256 at 11, ECF No. 30 at tab 6 ("Prelim. Dec. Memo"). To calculate

this rate, the Department determined the normal value of Stanley's exports using the nonmarket

economy method provided for in 19 U.S.C. § 1677b(c). Specifically, Commerce valued

---

[1]        Commerce presumes that exporters and producers from nonmarket economy
countries, such as China, are under foreign government control with respect to export activities
and thus should receive a single countrywide dumping rate. *See Yangzhou Bestpak Gifts &
Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013) (citing *Sigma Corp. v. United
States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)). This presumption is rebuttable, however, if a
company can demonstrate its independence from government control, both in law (*de jure*) and
in fact (*de facto*). *Sigma*, 117 F.3d at 1405. If the company successfully rebuts the presumption
of government control, it may be eligible for a separate antidumping duty rate. If not, it will be
considered part of the countrywide entity and will receive the countrywide rate. *See* 19 C.F.R.
§ 351.107(d) (2015).

Stanley's reported factors of production using import data from Thailand, the selected surrogate market economy country. Commerce determined surrogate values for Stanley's factors of production, including sealing tape and plastic granules, using publicly available Thai import prices, as reported in the Global Trade Atlas.[2]

In the preliminary determination, the Department calculated a rate for Stanley of 5.90 percent. *See Certain Steel Nails From the People's Rep. of China*, 81 Fed. Reg. 62,710, 62,711 (Dep't Commerce Sept. 12, 2016) (prelim. results). Commerce also preliminarily assigned to the Separate Rate Companies the rate of 5.90 percent. *See* 81 Fed. Reg. at 62,711.

Commerce, however, found Lianda's questionnaire responses lacking in that the company failed to rebut the presumption of state control. Specifically, Lianda's responses to Commerce's Section A questionnaire and supplemental questionnaires failed to provide requested information regarding Lianda's and its parent company's corporate structure. *See* Final I&D Memo at 28-29. Therefore, Commerce found Lianda had not provided sufficient information to establish that it was eligible for a separate rate. Accordingly, Commerce treated Lianda as a part of the countrywide entity and preliminarily assigned Lianda the PRC-wide rate of 118.04 percent.[3] *See* Prelim. Dec. Memo at 11.

---

[2]        The Global Trade Atlas is a secondary electronic source containing data reported by governments, including Thailand. *See* Prelim. Surrogate Values Mem. (Sept. 6, 2016), P.R. 257 at 2, bar code 3504509-01, ECF No. 30 at tab 15. Neither Commerce's selection of Thailand as the surrogate country, nor the use of GTA data to value factors of production is in dispute.

[3]        The PRC-wide rate was based on a rate found in the petition that started the initial investigation in 2007. *See Certain Steel Nails From the People's Rep. of China*, 73 Fed. Reg. 3928, 3935 (Dep't Commerce Jan. 23, 2008) (prelim. determ.); *see also Certain Steel Nails From the People's Rep. of China*, 73 Fed. Reg. 44,961 (Dep't Commerce Aug. 1, 2008) (notice of antidumping duty order).

In the Final Results, Commerce assigned Stanley the amended calculated rate of 5.78 percent, and continued to apply the PRC-wide rate of 118.04 percent to Lianda. For the companies that qualified for a separate rate, Commerce determined an all-others rate by applying the method set out in the general rule in § 1673d(c)(5)(A).[4] Thus, in accordance with the statute, Commerce excluded Lianda's rate from the calculation because it was based on facts available with an adverse inference ("AFA") and assigned Stanley's 5.78 percent rate—the only margin assigned to an individually examined respondent that was not zero, *de minimis*, or based entirely on facts available or AFA—to the Separate Rate Companies. This appeal followed.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

When merchandise is sold in the United States at less than fair value, Commerce is authorized by statute to impose antidumping duties in an amount equal to a "dumping margin."

---

[4]        The general rule states:

For purposes of this subsection . . . , the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title [*i.e.*, based on facts available or AFA].

19 U.S.C. § 1673d(c)(5)(A).

*See* 19 U.S.C. §§ 1673, 1677(35)(A). This margin reflects the amount by which the price of the merchandise in the exporting country ("normal value") exceeds the price of the merchandise in the United States ("export price" or "U.S. price"). *See* 19 U.S.C. §§ 1673e(a)(1), 1677b(a)(1), 1677a(a).

When the merchandise is exported from a nonmarket economy country, Commerce determines its normal value by valuing the factors of production, using data from a surrogate market economy country or countries. 19 U.S.C. § 1677b(c)(1). Commerce must use "the best available information regarding the values of such factors" in the market economy country that Commerce considers to be appropriate. *Id*. When choosing the "best available" surrogate data on the record, Commerce selects, to the extent practicable, surrogate data that is "publicly available, . . . product-specific, reflect[s] a broad market average, and [is] contemporaneous with the period of review." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (citations omitted).

Generally, Commerce is charged with determining individual dumping margins for each known exporter and producer. 19 U.S.C. § 1677f–1(c)(1). When it is "not practicable" to determine individual margins because of the large number of exporters involved in the review, however, the statute provides that Commerce may limit its examination to a "reasonable number of exporters or producers" (mandatory respondents) that either constitute a statistically representative sample of all known exporters or producers or account for the largest volume of the subject merchandise from the exporting country.[5] *Id*. § 1677f–1(c)(2); *see also* Statement of

---

[5]        "Non-selected parties can request individual examination pursuant to 19 U.S.C. § 1677m(a), but Commerce is not obligated to grant such requests." *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1348 (Fed. Cir. 2016); *see also* Statement of

(footnote continued . . .)

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–

316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200-01 ("SAA").[6] In this way, Commerce

may "reasonably approximate the margins of all known exporters," absent evidence that the

examined exporters' data is not representative. *Albemarle Corp. & Subsidiaries v. United States*,

821 F.3d 1345, 1353 (Fed. Cir. 2016) ("The statute assumes that, absent [contrary] evidence,

reviewing only a limited number of exporters will enable Commerce to reasonably approximate

the margins of all known exporters."). Commerce has been criticized in the past for selecting too

few exporters or producers to examine. *See, e.g.*, *Zhejiang Native Produce & Animal By-Prods.*

*Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 1129, 637 F. Supp. 2d 1260, 1263-64 (2009);

*Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 1726-29, 662 F. Supp. 2d 1337, 1341-44

(2009). As shall be seen, it is possible that such criticism is warranted here.

    In a nonmarket economy proceeding, Commerce presumes that respondents are state-

controlled. State control results in respondents being assigned the countrywide dumping rate. 19

C.F.R. § 351.107(d). The presumption of state control is rebuttable, however, and an exporter

that demonstrates sufficient independence (*de jure* and *de facto*) from state control may apply to

Commerce for a separate rate—that is, a rate for exporters that were not individually examined,

but not covered by the countrywide rate. *Sigma Corp. v. United States*, 117 F.3d 1401, 1405

---

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–
316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("Commerce may decline to analyze
voluntary responses because it would be unduly burdensome.")*.*

    [6]    In 1994, Congress enacted the Uruguay Round Agreements Act ("URAA"), Pub.
L. No. 103–465, 108 Stat. 4809 (1994), incorporating into U.S. law the Uruguay Round
Agreements adopted by the World Trade Organization. At the same time, Congress approved the
Statement of Administrative Action, 19 U.S.C. § 3511(a)(2), which is "an authoritative
expression" when interpreting and applying the URAA. *See* 19 U.S.C. § 3512(d).

(Fed. Cir. 1997); *see also Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1009

(Fed. Cir. 2017). This separate rate is also known as the "all-others" rate. *Albemarle*, 821 F.3d at

1348. The all-others rate is assigned to cooperative, non-individually examined exporters. 19

U.S.C. § 1673d(c)(1)(B)(i)(II).

Subsection 1673d(c)(5) of title 19 governs Commerce's calculation of the all-others rate.

Paragraph (A) provides:

**(A) General rule**

For purposes of this subsection . . . , the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title [*i.e.*, based on facts available or AFA].

19 U.S.C. § 1673d(c)(5)(A).[7] In the event that all of the individually investigated exporters'

margins are zero, *de minimis*,[8] or determined entirely on the basis of facts available or AFA

(under 19 U.S.C. § 1677e), the exception to the general rule in paragraph (B) applies:

**(B) Exception**

If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section 1677e of this title, [Commerce] may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated

---

[7]     *See* SAA at 4201 ("[T]he all others rate will be equal to the weighted-average of individual dumping margins calculated for those exporters and producers that are individually investigated, exclusive of any zero and *de minimis* margins, and any margins determined entirely on the basis of the facts available. Currently, in determining the all others rate, Commerce includes margins determined on the basis of the facts available.").

[8]     In administrative reviews, Commerce "will treat as *de minimis* any weighted-average dumping margin or countervailable subsidy rate that is less than 0.5 percent *ad valorem*, or the equivalent specific rate." 19 C.F.R. § 351.106(c).

> weighted average dumping margins determined for the exporters and producers individually investigated.

19 U.S.C. § 1673d(c)(5)(B).[9] In other words, when calculating the all-others rate, Commerce will use the weighted average of all mandatory respondents' rates, excluding any *de minimis* rates, or rates based entirely on facts available or AFA. If all dumping margins are only either *de minimis*, or determined entirely based on facts available or AFA, Commerce applies the exception found in § 1673d(c)(5)(B). "In such cases, Commerce 'may use any reasonable method to establish the estimated all others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.'" *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1673d(c)(5)(B)).

By its terms, § 1673d(c)(5) references investigations. Commerce, however, has an established, court-approved practice of applying this subsection in periodic reviews as well, both in market economy and nonmarket economy proceedings. *See Albemarle*, 821 F.3d at 1352 ("[T]he statutory framework contemplates that Commerce will employ the same methods for

---

[9]    The SAA provides the following guidance on the method Commerce may use when the exception to the general rule applies:

> [Title 19 U.S.C. § 1673d(c)(5)(B)] . . . provides an exception to the general rule if the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis*. In such situations, Commerce may use any reasonable method to calculate the all others rate. The expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available. *However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods*.

SAA at 4201 (emphasis added).

Case 1:17-cv-00051-RKE   Document 49   Filed 06/19/18   Page 11 of 26

Court No. 17-00051                                                        Page 11

calculating a separate rate in periodic administrative reviews as it does in initial investigations."); *see also Navneet Publications (India) Ltd. v. United States*, 38 CIT __, __, 999 F. Supp. 2d 1354, 1359 (2014) ("Though § 1673d(c)(5) explicitly references investigations, nothing in that statute or in any other statute expressly or impliedly precludes application to administrative reviews.").

## DISCUSSION

### I.     All-Others Rate Calculation

In the Final Results, Commerce calculated the all-others rate pursuant to the general rule set out in 19 U.S.C. § 1673d(c)(5)(A), and assigned the Separate Rate Companies a margin of 5.78 percent—a rate equal to the calculated rate of Stanley, the sole mandatory respondent with a rate that was not zero, *de minimis*, or based entirely on facts available or AFA. *See* Final I&D Memo at 21 ("When calculating a separate rate for non-individually reviewed respondents, the Department will base this rate on the estimated weighted-average dumping margins established for the individually examined respondents, excluding zero and *de minimis* margins or margins based entirely on AFA."). Mid Continent maintains that Commerce's calculation of the all-others rate is neither in accordance with law nor supported by the record.

As to Commerce's choice of method, Mid Continent takes the position that Commerce's decision to apply the general rule, and to exclude Lianda's AFA rate, was an unreasonable interpretation of the dumping statute because, in doing so, Commerce failed in its obligation to ensure that the all-others rate reflected the "economic reality" of the Separate Rate Companies. *See* Pl.'s Br. 12; *see also* SAA at 4201 (emphasis added) ("[Title 19 U.S.C. § 1673d(c)(5)(B)] . . . provides an exception to the general rule if the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis

of the facts available or are zero or *de minimis*. In such situations, Commerce may use any reasonable method to calculate the all others rate. The expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available. *However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods*.").

First, Mid Continent observes that while Congress amended § 1673d(c)(5)(A) to require the exclusion of AFA rates from the all-others rate calculation *in investigations*, it did not state "the appropriate [method] to be used in administrative reviews." Pl.'s Br. 17. For Mid Continent, this "intentional omission" shows that Congress wished Commerce to continue its pre-URAA practice of including AFA rates in the calculation of the all-others rate in administrative reviews. *See* Pl.'s Br. 15-17; *see* SAA at 4201 (noting that before the enactment of the URAA, "in determining the all others rate, Commerce includes margins determined on the basis of the facts available"). Thus, Mid Continent insists that in the underlying review Commerce should have exercised its authority under the dumping laws to devise a method that included the AFA rates of Lianda (the mandatory respondent that failed to establish independence from government control) and Suzhou (the mandatory respondent that withdrew from the review) in the calculation of the all-others rate. In particular, Mid Continent asks the court to remand with instructions that Commerce calculate the all-others rate as a simple average of the rates received by Stanley (5.78 percent), Lianda (118.04 percent), and Suzhou (118.04 percent). *See* Pl.'s Br. 27. Therefore, Mid Continent argues for a rate of 80.62 percent for the Separate Rate Companies.

Notwithstanding Mid Continent's arguments, Commerce's decision to apply the general rule in § 1673d(c)(5)(A) is in accordance with law. There can be no serious dispute the weight of

authority holds that "the statutory framework contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations," *Albemarle*, 821 F.3d at 1352 (citing 19 U.S.C. § 1675(a) (Supp. IV 2016)), and that these methods are to be employed, not only in market economy cases, but in nonmarket economy proceedings as well. *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1312 (Fed. Cir. 2017) (citing *Albemarle*, 821 F.3d at 1352 & n.6); *see also* Pl.'s Br. 14-15 (recognizing same). Moreover, as between the methods used to calculate the all-others rate, as stated in the general rule, and in the exception to that rule, the method set out in § 1673d(c)(5)(A) leaves little room for the exercise of discretion. *See* 19 U.S.C. § 1673d(c)(5)(A) ("[T]he estimated all-others rate *shall be* an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually [examined], excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.") (emphasis added).

Applying the statutory method, Commerce excluded the PRC-wide rate assigned to Lianda and relied on the only other calculated rate, in this segment, that was not zero, *de minimis*, or based entirely on facts available or AFA—*i.e.*, Stanley's 5.78 percent rate. While it may be that Commerce should have examined more potential respondents,[10] its method comports with the statute (the general rule in § 1673d(c)(5)(A)) and the guidance set out in the SAA. *See* SAA at 4201 ("[T]he all others rate *will be* equal to the weighted-average of the individual dumping margins calculated for those exporters and producers that are individually [examined], exclusive of any zero and *de minimis* margins, and any margins determined entirely on the basis

---

[10]        Indeed, had it done so, this lawsuit might have been avoided.

of the facts available."). Resort to the exception in paragraph (B), which permits Commerce to

use "any reasonable method," was not statutorily directed because the conditions for its

application—*i.e.*, that all calculated margins were zero, *de minimis*, or determined entirely based

on facts available or AFA—were not satisfied.[11] *See* SAA at 4201 ("[N]ew section

735(c)(5)(B) . . . provides an exception to the general rule *if the dumping margins for all of the*

*exporters and producers that are individually [examined] are determined entirely on the basis of*

*the facts available or are zero or* de minimis.") (emphasis added). Moreover, where the

exception does apply, the SAA states that Commerce may use "any reasonable method" only if

the "expected method" is not feasible:

> The expected method in such cases will be to weight-average the zero and *de*
> *minimis* margins and margins determined pursuant to the facts available, *provided*
> *that volume data is available.* However, if this method is not feasible, or if it
> results in an average that would not be reasonably reflective of potential dumping
> margins for non-investigated exporters or producers, Commerce may use other
> reasonable methods.

---

[11]     Mid Continent points out that the SAA permits the use of AFA rates in cases
where the exception (*i.e.*, § 1673d(c)(5)(B)) to the general rule applies. *See* Pl.'s Br. 16-18. That
is, Commerce may use "any reasonable method" where the mandatory respondents' margins are
zero, *de minimis*, or based entirely on facts available or AFA, and weight-averaging those
margins "results in an average that would not be reasonably reflective of potential dumping
margins . . . ." SAA at 4201. Mid Continent cites two cases, *Bestpak* and *Navneet*, as examples
of where Commerce applied § 1673d(c)(5)(B), although the facts did not fit neatly within the
statute. Acknowledging that these cases are distinguishable on their facts from the one presented
here, Mid Continent nonetheless argues that they stand for the proposition that "'rate
determinations for nonmandatory, cooperating separate rate respondents must . . . bear some
relationship to their actual dumping margin.'" Pl.'s Br. 22 (quoting *Bestpak*, 716 F.3d at 1380).
*Bestpak* and *Navneet* are, as Mid Continent acknowledges, distinguishable. In both of these
cases, Commerce did not apply the general rule, but rather employed the exception in
§ 1673d(c)(5)(B), because *all* individual dumping margins for the mandatory respondents were
zero, *de minimis*, or based on AFA. By contrast here, Commerce could, indeed must, use the
preferred, general rule to calculate an all-others rate based on Stanley's non-*de minimis*, non-
AFA rate.

SAA at 4201 (emphasis added). Mid Continent, however, makes no argument that there is a lack of volume data available in the record or that the usual method was unfeasible. Accordingly, Commerce's decision to apply the general rule in the underlying review was in accordance with law.

Next, Mid Continent argues that even if the application of § 1673d(c)(5)(A) was lawful, it was unreasonable "as applied" because it resulted in a margin that does not accurately reflect the dumping rate of the Separate Rate Companies. *See* Pl.'s Br. 17-18; Pl.'s Reply Br. 8. Even if this were a reason to ignore the statute, the court does not agree that Stanley's 5.78 percent margin *necessarily* does not accurately reflect the Separate Rate Companies' dumping rate. The record shows that Stanley was the largest exporter of subject merchandise, by volume, during the POR and, for that reason, was selected for individual examination by Commerce pursuant to 19 U.S.C. § 1677f–1(c)(2). This "suggests an assumption that [Stanley's data] can be viewed as representative of all exporters." *Albemarle*, 821 F.3d at 1353. That is, "[t]he statute assumes that, absent . . . evidence [that the largest volume exporter's data is not representative], reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." *Id*.

Mid Continent argues that record evidence demonstrates that Stanley's rate is not representative of the Separate Rate Companies' experience. In particular, it points to (1) the PRC-wide rate assigned to Lianda and Suzhou, and (2) the rates assigned to "non-Stanley" mandatory respondents in previous segments. *See* Pl.'s Br. 10-11 (table). For Mid Continent, these rates constitute substantial evidence that the all-others rate was untethered from the Separate Rate Companies' "economic reality and . . . experience." Pl.'s Br. 26 (arguing that because "all other individually-examined Chinese respondents . . . received much higher margins

in previous reviews," this shows that the 5.78 percent all-others rate "fail[s] to reflect economic reality and the specific experience of the Separate Rate Companies."). Mid Continent's representativeness argument, however, is not convincing.

As an initial matter, it was reasonable for Commerce to exclude Lianda's and Suzhou's rates from the all-others rate calculation in accordance with the plain language of § 1673d(c)(5)(A). While Mid Continent argues that Stanley's rate does not tie to the Separate Rate Companies, it is not clear that Mid Continent's proposed remedy would result in a more representative margin. The Separate Rate Companies are known, cooperative exporters that each established their eligibility for a separate rate. By contrast, Lianda failed to establish independence from government control, and Suzhou failed to cooperate with Commerce's requests for information. Thus, no actual rate was calculated for either company. Rather, they were assigned the PRC-wide rate—a rate that was derived from information found in the petition that commenced the 2007 investigation. It is difficult to credit the argument that inclusion of their 118.04 percent rates would result in an all-others rate that was "reflective" of the Separate Rate Companies' actual dumping margins where the commercial standing of these two companies is virtually unknown.

Second, the rates assigned to non-Stanley respondents in prior segments do not demonstrate that the general rule was unreasonable as applied. It is a commonplace that each "'administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.'" *Albemarle*, 821 F.3d at 1357 (quoting *Qingdao*, 766 F.3d at 1387). Indeed, part of the idea behind periodic reviews is to test if respondents that previously dumped have mended their ways. While the Federal Circuit has identified circumstances where it may, nonetheless, be reasonable to use information from prior

segments, those circumstances are not present here. For example, Mid Continent makes no argument that "the overall market and the dumping margins have not changed from period to period." *Id*. On the contrary, the fluctuation in margins over the last several segments suggests otherwise. Thus, "[t]his is not a situation in which there was any consistency with respect to the dumping margins of the individually examined respondents throughout the reviews." *Id*. Additionally, there has been no allegation that the Separate Rate Companies have failed to cooperate with Commerce such that the use of higher rates from a prior segment may be justified as AFA on deterrence grounds. *See id*.; *see also Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012) ("Deterrence is not relevant here, where the 'AFA rate' only impacts cooperating respondents.").

Finally, even if circumstances were such that it was reasonable to look to information from prior segments, it is difficult to see how the prior rates of non-Stanley mandatory respondents from the last six reviews and a new shipper review are probative of the Separate Rate Companies' dumping during the POR, when only two of those respondents are among the seventeen Separate Rate Companies chosen for the underlying review: Tianjin Jinghai County Hongli Industry and Business Co., Ltd. ("Hongli") and Tianjin Jinchi Metal Products Co., Ltd. ("Jinchi"). *See* 81 Fed. Reg. at 19,218. While it is true that Hongli and Jinchi have been individually examined before, these examinations took place in the second and third annual reviews, which covered the 2009 to 2010, and 2010 to 2011 periods, respectively—that is, several years prior to the POR of the underlying review. Thus, there is little to suggest that Hongli's and Jinchi's prior rates would be indicative of the "economic reality and actual dumping margins," Pl.'s Br. 18, of the Separate Rate Companies during the POR, as Mid Continent suggests.

Accordingly, the 5.78 percent all-others rate is in accordance with law and supported by substantial evidence.

## II.     Sealing Tape Valuation

In its Section D response regarding its factors of production, Stanley stated:

> During the POR, Stanley . . . purchased sealing tape and consumed this material to seal the cartons in the packaging of subject nails. The sealing tape is basic packaging tape made from biaxially oriented polypropylene and adhesive. It is purchased in rolls 60cm wide and 50 meters long.

Stanley's Sec. D Resp., P.R. 111 at 103, bar code 3442643-02, ECF No. 30 at tab 14.

Before Commerce, Mid Continent argued that the Department should value Stanley's sealing tape under Thai Harmonized Tariff Schedule ("HTS") subheading 3919.10, covering "Plates, Sheets, Film, Foil, *Tape*, And Other Flat Shapes Of Plastics, *Self-Adhesive*, In Roll Not Over 20 Cm. (8 in.) Wide." Final I&D Memo at 31-32 (emphasis added). For its part, Stanley argued against using that subheading "because Thai HTS subheading 3919.10 is a general basket category that does not differentiate products based on the kind of plastic from which the tape is made." Final I&D Memo at 32. Instead, Stanley argued in favor of Thai HTS subheading 3920.20.10, covering "Other plates, sheets, film, foil, and strip of plastics, non-cellular and not reinforced, laminated, supported, or similarly combined with other materials: of polymers of polypropylene: *biaxially oriented polypropylene film*." Final I&D Memo at 32 (emphasis added).

In the Final Results, Commerce agreed with Stanley's proposed HTS subheading, stating:

> In its Section D questionnaire response, Stanley describes its sealing tape as "basic packaging tape made from biaxially oriented polypropylene and adhesive." Based on the Thai description Thai GTA data under HTS 3920.20.10, we find that Stanley's sealing tape is included in this HTS category. Accordingly, for these final results, we will use Thai HTS 3920.20.10 to value Stanley's sealing tape.

Final I&D Memo at 32 (footnotes omitted); *see also* Final Surrogate Value Mem. (Mar. 13, 2017), P.R. 292 at 1, bar code 3553207-01, ECF No. 39 at tab 16.

Before the court, Mid Continent maintains that substantial evidence does not support Commerce's choice of Thai HTS subheading 3920.20.10. *See* Pl.'s Br. 28. For Mid Continent, this subheading does not cover the most important aspect of the sealing tape, *i.e.*, that it is adhesive. *See* Pl.'s Br. 28-29. Instead, Mid Continent again argues for Thai HTS subheading 3919.10, covering "Plates, Sheets, Film, Foil, Tape, And Other Flat Shapes Of Plastics, Self-Adhesive, In Roll Not Over 20 Cm. (8 in.) Wide," to value the sealing tape input. Pl.'s Br. 29. For Mid Continent, even though it is a basket provision, subheading 3919.10 covers self-adhesive plastic tape that, Mid Continent contends, more closely describes the sealing tape Stanley reported using. Accordingly, Mid Continent asks the court to remand with instructions to use Thai HTS subheading 3919.10. Pl.'s Br. 29.

The Government counters that Commerce's use of Thai HTS subheading 3920.20.10 is supported by the record and constitutes the "best available information" to value Stanley's sealing tape. Def.'s Resp. 22. As noted, this subheading covers "Other plates, sheets, film, foil, and strip of plastics, non-cellular and not reinforced, laminated, supported, or similarly combined with other materials: of polymers of polypropylene: biaxially oriented polypropylene film." According to the Government, "[t]he crux of Mid Continent's argument is that the *end use* of Stanley's sealing tape is a more important consideration than the *base material* when valuing the input." Def.'s Resp. 23 (emphasis added). The Government argues, however, that Commerce's choice of the more specific subheading (*i.e.*, not a basket provision) was reasonable: "Commerce determined that Thai HTS category 3920.20.10 is the most product specific because, [like] Stanley's sealing tape, the tape is made from biaxially oriented polypropylene film." Def.'s Resp. 23; *see also* Stanley's Br. 12, 14 ("The record evidence irrefutably established that Stanley's sealing tape was manufactured from biaxially oriented polypropylene. Commerce

therefore reasonably based the surrogate value for this input on the Thai HTS subheading that expressly described products manufactured from biaxially oriented polypropylene," rather than "inputs made of undifferentiated 'plastic.'"). Thus, the Government asks the court to sustain Commerce's valuation of Stanley's sealing tape.

Commerce is charged with the duty of choosing the "best available" surrogate data on the record to value inputs. 19 U.S.C. § 1677b(c)(1). Among the criteria that the Department considers when selecting from among the available surrogate data is product specificity. *See Qingdao*, 766 F.3d at 1386. In the Final Results, Commerce identified the base material of the sealing tape reportedly used by Stanley (biaxially oriented polypropylene), as expressly described in Thai HTS subheading 3920.20.10, whereas the basket provision proposed by Mid Continent generally covers "plastics." The Department, then, reasonably chose to use import data under the HTS subheading that more closely matched the description of the base material in Stanley's packing tape. *See SolarWorld Americas, Inc. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1254, 1270 (2017) (sustaining Commerce's selection of HTS categories to value respondents' backsheets input where "the primary material in each respondent's backsheets was reflected in the specific material of each category"). While Mid Continent's argument has some appeal, it does not carry the day over Commerce's choice of the subheading that is specific to the type of plastic from which Stanley's tape was actually made. Because there is no record evidence as to which component (plastic or adhesive) constitutes a greater proportion of the value of the tape, it cannot be said that Commerce did not fulfill its charge to choose the best available information. Therefore, substantial evidence supports Commerce's conclusion that the best available information to value Stanley's packing tape was the HTS subheading that best described the material from which Stanley's tape was made.

### III.    Plastic Granules Valuation

In its Section D response, Stanley stated that it "purchased plastic granules made of calcium carbonate reinforced polypropylene plastic from a non-market economy supplier and consumed this material in the production of plastic-collated nails." Stanley's Sec. D Resp., P.R. 110 at 36, bar code 3442643-01, ECF No. 30 at tab 14. The plastic granules are subjected to a heating process, and, when melted down, are used to bind loose nails together. In particular, "[p]lastic granules [move] from [a] pipe into [a] heater[,] become soft after heating, and [are] extruded onto nails surface . . . [and] then plastic will adhere onto nails." Stanley's Sec. D Resp., P.R. 113, Ex. D-15, ECF No. 30 at tab 14. A purpose of the collating is to permit the nails to be loaded into a nail gun.

Before Commerce, Mid Continent argued that Commerce should use Thai HTS subheading 3921.90.90, covering "Other plates, sheets, film, foil and strip, of plastics" to value the granules input. *See* Pl.'s Br. 30. According to Mid Continent:

> [t]he Department incorrectly valued plastic granules [in] the *Preliminary Results* using HTS 3902.10.90.090, "Other," which falls under HTS 3902.10, "Polypropylene, In Primary Forms."  . . . Stanley reported that its plastic granules are made from "calcium carbonate reinforced polypropylene plastic" indicating that the granules contain more than just polypropylene. As a result, the Department should value Stanley's plastic granules input using the Thai HTS category 3921.90.90.

Final I&D Memo at 32. In other words, Mid Continent argued that Commerce's preferred subheading was not specific to the type of plastic Stanley used.

Stanley opposed Mid Continent's argument, saying:

> The Department should value plastic granules using the Thai HTS category[] 3902.10.90, which follows the Department's practice on this same issue in the three immediately preceding segments. The notes of HTS Chapter 39 clearly demonstrate that Stanley's plastic granules should not be classified under HTS 3921.90.90.

Final I&D Memo at 32. HTS Chapter Note 10, which pertains to subheading 3921.90.90, *i.e.*, the

subheading proposed by Mid Continent, explains that

> In heading[] . . . 39.21, the expression "plates, sheets, film, foil and strip" applies
> only to plates, sheets, film, foil and strip . . . and to blocks of regular geometric
> shape, whether or not printed or otherwise surface-worked, uncut or cut into
> rectangles (including squares) but not further worked (even if when so cut they
> become articles ready for use).

Explanatory Note 10, Chapter Notes to Chapter 39, *available at* http://www.wcoomd.org/-

/media/wco/public/global/pdf/topics/nomenclature/instruments-and-tools/hs-nomenclature-

2012/hs-2012/0739_2012e.pdf?la=en ("Chapter Notes"). Stanley argues that the above note does

not describe its plastic granules. Rather, Chapter Note 6, which pertains to HTS subheading

3902.10.90, expressly covers granules sold in bulk, like Stanley's: "[T]he expression 'primary

forms' applies only to the following forms : . . . (b) Blocks of irregular shape, lumps, powders

(including moulding powders), *granules*, flakes and similar bulk forms." *Id*., Chapter Note 6

(emphasis added). Thus, for Stanley, Mid Continent's preferred subheading was not the best

available information because it did not describe the plastic granules Stanley consumed in the

production of its nails. *See* Stanley Br. 9 ("Stanley's plastic granules are not plates, sheets, film,

foil or strip, and, for that reason, they would not be classified under subheading 3921.90.90.").

In the Final Results, Commerce used Thai HTS subheading 3902.10.90, covering

"Polymers of polypropylene . . . in primary forms: Polypropylene: Other," to value the plastic

granules, and rejected Mid Continent's proposed HTS subheading 3921.90.90, covering "Other

plates, sheets, film, foil and strip, of plastics." By way of explanation, Commerce stated:

> The Department addressed this issue in the three previous administrative reviews.
> There, we fully explained our rationale for using Thai HTS 3902.10.90, namely
> that Stanley's plastic beads more closely match the description under this HTS
> category. This HTS category more specifically covers Stanley's plastic beads
> because it covers polypropylene and not just "plastic." Additionally, there is no
> record evidence that Stanley's plastic beads lend themselves to being cut into

> regular shapes as per HTS 3921 categories. We find that these same reasons are
> supported by the record of this administrative review. Thus, for the final results,
> we will . . . value Stanley's plastic granules . . . using Thai HTS subheading
> 3902.10.90.

Final I&D Memo at 33 (footnotes omitted).

Before the court, Mid Continent argues that Commerce's determination to use Thai HTS

subheading 3902.10.90 was not supported by substantial evidence. This is because, in Mid

Continent's view, "Stanley's plastic granules are not polypropylene *in a primary form*." Pl.'s Br.

30 (emphasis added). "Rather, they are made from 'calcium carbonate reinforced polypropylene

plastic,'" *i.e.*, a product that contains "more than just polypropylene." Pl.'s Br. 30 (quoting

Stanley's Sec. D Resp.). Mid Continent characterizes Stanley's granules as "finished products,"

not "bulk raw materials in a primary form." Pl.'s Br. 30. That they are melted down to collate

nails, and require no further processing to use them, in Mid Continent's view, reinforces that the

granules are not in "primary form." Pl.'s Br. 30-31. Moreover, Mid Continent disagrees with

Commerce's assertion that "there is no record evidence that Stanley's plastic beads lend

themselves to being cut into regular shapes as per HTS 3921 categories." Final I&D Memo at 33.

To the contrary, Mid Continent points to a photograph attached to Stanley's Section D

questionnaire response, which "clearly shows that the granules are cut into regular shapes." Pl.'s

Reply. Br. 15. Mid Continent asks the court to remand this issue with instructions that

Commerce "value Stanley's plastic granules using Thai HTS number 3921.90.90," the

subheading that covers "Other plates, sheets, film, foil and strip, of plastics," *i.e.*, "finished

products containing more than just polypropylene in primary form." Pl.'s Br. 31, 32.

The Government and Stanley disagree with Mid Continent and ask the court to sustain

Commerce's valuation of Stanley's plastic granules. First, the Government argues that the HTS

subheading selected by Commerce is more specific to "polypropylene" (the kind of plastic

Stanley represented using) than the subheading proposed by Mid Continent, which covers "plastics." Def.'s Resp. 24. Indeed, Stanley described its plastic granules as made of calcium carbonate reinforced *polypropylene plastic* in its Section D response.

Next, Stanley argues that Mid Continent's characterization of "primary form" reveals a misunderstanding of that term's meaning. *See* Stanley's Br. 8. Chapter Note 6 to Chapter 39 of the Thai HTS states that the term "primary form" as used in subheading 3902.10.90 "refers only to the *physical* form of the imported polypropylene," including, expressly, "granules . . . and similar bulk forms." Stanley's Br. 9-10 (quoting Chapter Notes, Note 6) (emphasis added). Therefore, according to Stanley, "Mid Continent's assertion that the mere presence of calcium carbonate precludes classification of Stanley's plastic granules as polypropylene in primary form has no merit" as a matter of law. Stanley's Br. 11. Moreover, as a factual matter, Stanley argues that the photographs on the record show "conclusively that the plastic granules were individually no larger than 4 millimeters and were sold in 25 kilogram bags," and therefore, "fit the physical description of 'primary form' in the Thai HTS and that they are sold in bulk." Stanley's Br. 11. Accordingly, Stanley and the Government argue that Commerce's use of Thai HTS subheading 3902.10.90, covering "Polymers of polypropylene . . . in primary forms: polypropylene: Other" to value Stanley's plastic granules was supported by the record and should be sustained.

Based on the record evidence, Commerce's choice of Thai HTS subheading to value Stanley's plastic granules is the best available information. In its questionnaire responses, Stanley described the granules as made from polypropylene plastic, which Commerce reasonably found was more specifically described in subheading 3902.10.90 ("polypropylene"), than in 3921.90.90 ("plastics"). *See Qingdao*, 766 F.3d at 1386.

Mid Continent's argument that the polypropylene is not "pure," and therefore is not "in primary form," seems to misstate the idea of what "in primary form" means as explained in the Chapter Notes. Rather than focusing on the chemical composition of the polypropylene, the notes indicate that "in primary form" refers to the polypropylene's physical shape (*e.g.*, blocks of irregular shapes, powders, flakes and granules) and whether it is sold in bulk form. That is, in primary form means not ready for its ultimate use but, for instance, as here, suitable to be melted down and further applied to a saleable product. Additionally, photographic evidence placed on the record by Stanley indicates that the plastic input at issue here is, indeed, polypropylene plastic pieces measuring no more than 4 millimeters each, and that are sold in bulk form (25 kilogram bags). *See* Stanley's Sec. D Resp., P.R. 113 at bar code 3442643-04.

Finally, starting in the fourth review Commerce rejected HTS subheading 3921.90.90 because Stanley's granules were not cut into regular shapes as a part of the manufacturing process. *See Certain Steel Nails From the People's Rep. of China*, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results of the fourth periodic review) and accompanying Issues and Dec. Mem., Cmt. 11[12]; *see also* Explanatory Note 10, Chapter Notes ("In heading[] . . .

---

[12]     There, Commerce found that

HTS categories under 3921 only apply to plates, sheets, film, foil, strips and to blocks of regular geometric shapes whether cut or uncut. In addition, information on the record for another HTS (3902.1090) indicates that it is for polymers of polypropylene in "primary form" (i.e., blocks of irregular shape, lumps, powders, granules, flakes, and similar bulk forms). We find that Stanley's plastic beads more closely match the description under HTS 3902.10.90 as: 1) this HTS is more specific because it relates to polypropylene and not just "plastic;" 2) there is no indication that Stanly's plastic beads were purchased in a form other than bulk; and, 3) there is no indication that Stanley's plastic beads lend themselves to be cut into regular shapes, as HTS categories under 3921 imply. Thus, for the final results we will use HTS 3902.10.90 to value Stanley's plastic beads.

(footnote continued . . .)

39.21, the expression 'plates, sheets, film, foil and strip' applies only to plates, sheets, film, foil

and strip . . . and to blocks *of regular geometric shape*, whether or not printed or otherwise

surface-worked, uncut or cut into rectangles (including squares) but not further worked (even if

when so cut they become articles ready for use)."). Stanley's granules were melted down.

Accordingly, there was no need for the granules to "lend themselves to being cut into regular

shapes as per HTS 3921 categories," Final I&D Memo at 33, making subheading 3921.90.90 less

specific. The record here supports the conclusion that Stanley's polypropylene granules are

specifically covered by HTS subheading 3902.10.90 and the Chapter Notes, and therefore,

import information pertaining to that subheading was the best available surrogate data to value

that input.


## CONCLUSION

Commerce's application of the general rule in § 1673d(c)(5)(A) to calculate the all-others

rate comported with the statute, and is supported by substantial evidence. Also, Commerce's

surrogate value determinations on sealing tape and plastic granules are supported by substantial

evidence and are, therefore, sustained. Judgment shall be entered accordingly.


                                                    _____/s/ Richard K. Eaton_____
                                                       Richard K. Eaton, Judge

Dated:          June 19, 2018
                New York, New York

---

Issues and Dec. Mem., Cmt. 11, accompanying *Certain Steel Nails From the People's Rep. of China*, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014).